UNITED STATES of America,
Plaintiff,

v.

CONSOLIDATION COAL COMPANY,
et al., Defendants.

Nos. C–2–94–248, C–2–94–785.

United States District Court,
S.D. Ohio,
Eastern Division.

Jan. 31, 2002.

Daniel M. Darragh, Pittsburgh, PA, for Consolidation Coal Company.

Joseph D. Lonardo, Columbus, OH, for Triangle Wire & Cable, Inc.

Joel L. Lennen, Pittsburgh, PA, for Neville Chemical Company.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR ENTRY OF FINAL JUDGMENT

GEORGE C. SMITH, District Judge.

Third-party plaintiffs Consolidation Coal Company ("Consol") and Triangle Wire & Cable, Inc. ("Triangle") seek a declaration of liability and the equitable allocation of response costs against third-party defendant Neville Chemical Company ("Neville") under §§ 107 and 113 of the Comprehensive Environmental Response Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9607 and 9613. This case concerns the Buckeye Reclamation Landfill ("BRL"), located near St. Clairsville, in Belmont County,

Ohio. This matter proceeded to a bench trial.[1] For reasons that follow, the Court finds that Neville is liable under CERCLA, and allocates to Neville a 6% share of past and future response costs for cleanup of the BRL.

## I. Preliminary Issues

Before the Court turns to its findings and conclusions in this case, it must first address two motions that were filed immediately before the trial: Neville's motion for summary judgment, and Consol's motion for leave to amend to add itself as a named third-party plaintiff with a claim against Neville.

### A. Neville's Summary Judgment Motion

On the eve of the bench trial, Neville moved for summary judgment (Doc. 512 in Case No. C–2–94–248; Doc. 436 in Case No. C–2–94–785) on the ground that all pending claims against it in this action have been extinguished. First, Neville maintains that Consol has not asserted a claim directly against Neville. Second, Neville asserts that Triangle's contribution claim against it is barred under § 4(b) of the Uniform Comparative Fault Act ("UCFA") because the settlement agreement between Triangle and Consol did not extinguish Consol's potential claims against Neville.[2]

As an initial matter, the Court finds that Neville's eleventh-hour motion borders on bad faith, and smacks of having been presented for the improper purpose of delaying the trial. It was filed after Neville agreed to participate in a trial with Consol and Triangle as third-party plaintiffs, a decision Neville made after it was informed of the settlement between Consol and Triangle, Fed.R.Civ.P. 11(b)(1). This alone is sufficient basis for denial of Neville's motion. The Court will, nevertheless, proceed to examine Neville's motion on the merits.

■ "The UCFA is not a federal law, and [the court is] not bound by the parties' agreement to an inapplicable body of legal rules." *Akzo Nobel Coatings, Inc. v. Aigner Corp.*, 197 F.3d 302, 306 (7th Cir.1999)(opinion by Easterbrook, J.)(reversing district court for applying UCFA §§ 2 and 6 to CERCLA allocation). Specifically, the UCFA does not govern Consol's and Triangle's contribution claims under CERCLA § 113(f). *See id.* at 307.

In 1986, Congress created the second CERCLA cause of action when it enacted the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), which allows potentially responsible parties[3] ("PRPs") to seek contribution from other PRPs for their proportionate share of

---

1. The bench trial consisted of a summary presentation of evidence by agreement of the parties, somewhat akin to a summary jury trial. The parties thereafter submitted stipulations and a large volume of documents for the Court's consideration. As one commentator has noted, "CERCLA's contribution provision does not require a district court to use any particular procedure when making an allocation decision." Robert P. Dahlquist, *Making Sense of Superfund Allocation Decisions: The Rough Justice of Negotiated and Litigated Allocations*, 31 Envtl. L. Rep. 11098, 11106 (2001).

2. The Uniform Comparative Fault Act § 4(b) provides:

Contribution is available to a person who enters a settlement with a claimant only (1) if the liability of the person against whom contribution is sought has been extinguished and (2) to the extent that the amount paid in settlement was reasonable. 12 U.L.A. 53 (Supp.1992).

3. While CERCLA does not define "potentially responsible party," the courts have understood it to refer to a party who may be covered by the statute at the time that the party is sued under the statute. *See, e.g., OHM Remediation Servs. v. Evans Cooperage Co., Inc.*, 116 F.3d 1574, 1582 (5th Cir.1997); *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir.1996).

costs associated with hazardous waste cleanup. *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 348–356 (6th Cir.1998). The express language of the SARA amendment to CERCLA does not condition the right of contribution upon compliance with § 4(b) of the UCFA. Indeed, the district judge who penned the decision upon which Neville primarily relies clearly recognized this point. *See Amland Properties Corp. v. Aluminum Co. of Amer.*, 808 F.Supp. 1187, 1198 (D.N.J. 1992), *aff'd*, 31 F.3d 1170 (3d Cir.1994).

█ Significantly, in *Amland*, unlike the instant case, the action had not been brought by the United States. Here, the United States is the plaintiff. Hence, in the case at bar, and in contrast to *Amland*, the parties that settled with the United States have an express statutory right of contribution under CERCLA § 113(f)(3)(B):

> A person who has resolved its liability to the United States or a State for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).

42 U.S.C. § 6713(f)(3)(B). The *Amland* court recognized this distinction:

> were this action one brought by the United States or by a State, it is clear that the viability of Alcoa's right to contribution would not depend on whether it had extinguished all claims against other defendants.

808 F.Supp. at 1198. Here, the Court has recognized that the United States is the real plaintiff in this action. In addition, both Triangle and Consol have resolved

their liability to the United States. Thus, *Amland* does not support Neville's "extinguishment" argument.

Morever, if *Amland* did apply, the Court would decline to follow it for two reasons. First, as Judge Easterbrook observed in *Akzo*, CERCLA contribution actions are not governed by the UCFA in the first instance. Second, the interest UCFA § 4(b) advances—the prevention of multiple recoveries for the same wrong—is adequately protected in this federal CERCLA action. Simply stated, if the Court enters a final judgment against Neville, allocating response costs, the Court would not allow a later claim by any party that would represent a multiple recovery of the same response costs, whether such a claim was brought in this or another court.[4] In sum, the Court finds that UCFA § 4(b) does not provide a basis for summary judgment on Consol and Triangle's claims for contribution.

For the above reasons, the Court **DENIES** Neville's motion for summary judgment (Doc. 512 in Case No. C–2–94–248; Doc. 436 in Case No. C–2–94–785).

### B. Consol's Motion for Leave to Amend

Consol moves to amend the amended third-party complaint to add Consol as a named third-party plaintiff with a claim against Neville (Doc. 509 in Case No. C–2–94–248; Doc. 433 in Case No. C–2–94–785).[5] Consol seeks to assert such a claim on its own behalf, and as assignee of the contribution claims of the following potentially responsible parties: Allegheny Ludlum Corporation ("Allegheny Ludlum"), Aristech Chemical Corporation ("Aris-

---

4. The Court would have authority to issue an injunction under the All Writs Act, 28 U.S.C. § 1651, if necessary, to aid its jurisdiction and protect its judgment by preventing actions for multiple recovery in other courts.

5. Third-party plaintiff Triangle asserted a contribution claim against Neville in the amended third-party complaint filed on April 7, 1997 (Doc. 109 in Case No. C–2–94–248; Doc. 53 in Case No. C–2–94–785).

tech"), Ashland, Inc. ("Ashland"), Beazer East, Inc. ("Beazer"), National Steel Corporation ("National Steel"), The Pullman Company ("Pullman"), SKF USA Inc. ("SKF"), USX Corporation ("USX") (collectively, the "Group of Eight"); and Wheeling–Pittsburgh Steel Corporation ("Wheeling–Pitt"). Consol maintains that Neville will not be prejudiced by the amendment of the pleadings.

◼ Under Fed.R.Civ.P. 15(a), leave to amend a pleading shall be freely given "when justice so requires." Several factors should be considered in determining whether to grant a motion to amend:

> Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment are all factors which may affect the decision. Delay by itself is not sufficient reason to deny a motion to amend. Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted.

*Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir.1989) (quoting *Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir.1973)). *See also Coe v. Bell*, 161 F.3d 320, 341–42 (6th Cir.1998), *cert. denied*, 528 U.S. 842, 120 S.Ct. 110, 145 L.Ed.2d 93 (1999).

Neville argues that it will suffer substantial prejudice if the Court grants Consol leave to amend. Neville contends that it has been prejudiced by Consol's refusal to provide timely and accurate discovery on its allocation position. Specifically, Neville charges that Consol avoided providing complete discovery on its allocation position, indicating that at the proper time Consol would submit an expert's allocation report. Consol, however, never named an allocation expert, and after discovery was closed, Consol submitted an "allocation po-

sition statement," which stated that allocation was a matter of law and equity, and that it was not an appropriate subject of expert testimony. Neville asserts that it has been prejudiced by Consol's actions because, without the ability to probe Consol's allocation position through discovery, Neville is unable to respond to it adequately.

◼ The Court rejects Neville's argument. First, it is difficult to fathom how Neville is prejudiced by an opposing party's *failure* to submit an expert opinion. Rather, such a failure would more logically prejudice the party who lacks an expert to support its position. Furthermore, Neville has, in fact, responded to Consol's position on allocation, including Consol's assertion that Neville's share should be enhanced for Neville's alleged failure to cooperate in the CERCLA process. Indeed, the alleged failure to cooperate is the lynchpin of both Triangle's and Consol's positions on allocation. Their allocation position is based upon equitable arguments concerning Neville's alleged failure to provide truthful or complete answers to government officials investigating the BRL, and its failure to participate, cooperate, or contribute with respect to the CERCLA cleanup process at the BRL, as opposed to matters such as relative toxicity or volume about which an allocation expert might be expected to testify. As such, it is understandable that Consol did not submit an expert report.

Furthermore, the Court finds that there is an insufficient nexus between the prejudice Neville argues it suffered and Consol's motion for leave to amend. That is, the alleged prejudice does not flow from the proposed amendment, but from unrelated conduct. In this sense, denying leave to amend is not an appropriate remedy for Consol's alleged misconduct. The proper remedy for Consol's alleged failure to provide discovery would have been un-

der Fed.R.Civ.P. 37, as appropriate, following a motion to compel.

The Court finds that Neville will not be prejudiced by the proposed amendment. Neville was named as a third-party defendant in the amended third-party complaint filed in April 1997. The contribution claims raised by the other third-party plaintiffs, including the Group of Eight, Wheeling–Pitt (whose claims have since been assigned to Consol) and Triangle, are of course identical to the claim Consol seeks to assert in its proposed amendment. So Consol's proposed amendment would not result in an unfair surprise to Neville; Neville should be prepared to defend the exact claim Consol moves to add. Neville also participated in extensive discovery in this case. Indeed, the nature of Neville's un-litigated discovery dispute with Consol anticipates or at least tacitly acknowledges that Consol was asserting, or intended to assert, a contribution claim against Neville.

Moreover, in May 1999 the Court set this case for a trial to begin in October 1999. Before Consol filed its motion for leave to amend, Neville prepared for trial, and agreed to participate in a summary bench trial, as reflected in the Court's October 21, 1999 order (Doc. 508 in Case No. C–2–94–248; Doc. 432 in Case No. C–2–94–785). Such an agreement would seem to have been with the knowledge that Consol intended to assert a contribution claim against Neville. As with its summary judgment motion, Neville's last-minute assertion of unfair prejudice seems disingenuous as best. In short, Consol's proposed amendment will not result in substantial prejudice or surprise to Neville.

Although Consol waited until the eve of trial to seek leave to amend, in the absence of prejudice, the Court finds that Consol's motion is well-taken. The Court **GRANTS** Consol's motion for leave to amend (Doc. 509 in Case No. C–2–94–248; Doc. 433 in Case No. C–2–94–785).

## II. Findings of Fact

### A. The Parties

1. The three remaining parties in this contribution action are: (a) Consol, individually and as assignee of the BRL CERCLA contribution rights of the Group of Eight and Wheeling–Pitt; (b) Triangle; and (c) Neville.

2. Each of the three remaining parties is a PRP for purposes of liability under CERCLA. Consol owned the land on which the BRL is located. Consol, Triangle, and Neville each generated hazardous substances that were disposed of at the BRL.

### B. Background and History of the BRL

3. From 1934 to 1954, Consol's predecessor in interest, Hanna Coal Company, operated the Willow Grove Mine, near the town of Neffs, Ohio, on a 658–acre premises to the south and west of the current location of the BRL. Willow Grove was a deep coal mine, which produced coal from the Pittsburgh No. 8 coal seam. The coal contained sulfur. Willow Grove produced about 19 million tons of coal.

4. In about 1936, Willow Grove completed a new coal preparation plant to separate coal from rock and other geologic material. The operation of the preparation plant generated waste products, including "Gob," which consists of coal, rock, clay, and other naturally occurring geological materials. The plant also generated fly ash and effluent.

5. Throughout the operation of the Willow Grove Mine and preparation plant, Gob and effluent were disposed of at the current location of the BRL, on a hillside behind the preparation plant and in parts of the premises known as the King's Run

Drainage Ravine and the Unnamed Run Drainage Ravine.

6. The Gob at the BRL contains hazardous substances, including arsenic, chromium, and lead.

7. Consol permanently closed the Willow Grove Mine in 1954.

8. From 1954 until 1970, the property that is now the BRL was essentially left vacant.

9. In late 1968, the Belmont County Board of Commissioners resolved to form a solid waste disposal district within the county under Ohio Rev.Code § 343.01.

10. Pursuant to Ohio Rev.Code § 343.01, the Commissioners adopted rules and regulations governing the sanitary district. The rules prohibited the disposal of waste originating outside Belmont County without prior written consent of the Board of Commissioners. The rules provided that the operator of the landfill would pay the county 10% of the landfill's gross operating revenues. The rules further provided that once the landfill was established, all other licenses or permits for disposal of waste within the county would expire within 30 days, after which time the landfill would be the exclusive site for disposal within Belmont County.

11. In May 1970, Belmont County solicited bids for operation of the landfill. Cravat Coal Company ("Cravat") d/b/a Buckeye Reclamation Company submitted the winning bid. On May 25, 1970, Cravat entered into a contract with Belmont County whereby Cravat agreed to: lease or own a landfill site; pay Belmont County a monthly fee of 10% of gross revenues; accept only solid waste from Belmont County or the contiguous counties unless it had prior written consent of the Board of Commissioners; obtain and maintain all necessary permits and approvals; to comply with all applicable laws; and, hold Belmont County harmless for any liability arising from operation of the landfill. The contract also set the initial prices Cravat could charge for disposal.

12. Direct regulatory oversight of the BRL operation was vested in the Belmont County Health Department and the Ohio Environmental Protection Agency ("OEPA"). The Belmont County Board of Commissioners employed a district sanitarian to conduct visual inspections of the BRL to ensure its compliance with the terms of the contract with Belmont County. Neither the inspector, the Belmont County Health Department, nor the Belmont County Board of Commissioners had any supervisory authority over the BRL employees or assumed any actual or financial responsibility for the operation of the BRL.

13. During the twenty-one years the BRL was operating, Belmont County collected a total of about $525,000 in franchise fee payments from the BRL operators. During the same period of time, Belmont County paid about $480,000 to the district sanitarian for salary and related expenses.

14. On October 30, 1970, Consol entered into a corrected[6] lease agreement with Michael Puskarich, the president and a major shareholder of Cravat, whereby Consol agreed to lease the BRL property to Puskarich for a period of ten years. The lease agreement contained provisions whereby the lessee promised to use the premises in a safe manner, to comply with applicable laws and obtain necessary permits, to do all things necessary to avoid air and stream pollution, and to indemnify Consol for any liability arising from the use of the premises. The lease was made

---

6. The original lease agreement, dated May 25, 1970, contained errors in the description of the property. The corrected lease agreement remedied these errors, and its terms were substantially the same as those in the original lease.

effective May 25, 1970. Puskarich assigned his interest in the lease to Cravat in 1971. During the lease period, until October 1975, Cravat operated the BRL.

15. In October 1975, Consol sold the land on which the BRL was located, and other property, to Ohio Resources Company ("Ohio Resources")[7] for the sum of $150,000. Consol sold only the surface rights to the property. It continues to own the mineral, oil and gas rights to the property. The deed stated in part: "Grantee for itself ... does hereby acknowledge the presence of a mine gob pile or slate dump on the above-described tracts of land and the same is the primary consideration for the conveyance." An internal Consol memorandum dated August 23, 1977, concerning a corrected deed issued in 1977, states: "We are aware of the inadequate description, but proceeded with the conveyance inasmuch as said Grantee was willing to accept liability for the mine gob pile and we were most anxious to divest ourselves of this encumbrance, as quickly as possible."

16. Ohio Resources, d/b/a Buckeye Reclamation Company, continued operating the BRL until the BRL closed.

17. Cravat and Ohio Resources, d/b/a Buckeye Reclamation Company, controlled and operated the BRL on a day-to-day basis. Indicia of Cravat and/or Ohio Resources' control included: hiring and paying BRL employees; after October 1975, ownership of the surface portion of property on which the BRL was located; ownership of the equipment used at the BRL; and making decisions to accept industrial waste at the BRL.

18. The BRL was operated in a fifty to sixty acre area of the Kings Run Ravine. The area is about 3,500 feet long (generally north to south), and about 1,000 feet wide east and west. For the most part, the BRL was constructed and operated in the Gob pile in the Kings Run Ravine.

19. The parties have stipulated that the BRL site is a CERCLA "facility" within the meaning of 42 U.S.C. § 9601(9).

20. The BRL ceased operation in April 1991.

### C. Background of Waste Disposal at the BRL

21. During the BRL's operation from 1970 until 1991, 800,000 to 1,000,000 tons of waste were disposed of at the BRL. Three categories of waste were disposed of at the BRL: industrial waste; municipal waste; and Gob.

#### 1. Industrial Waste

22. About 45,000 tons of industrial waste were disposed of at the BRL. From 1972 to 1980, most of the industrial waste at the BRL was disposed of in an area known as the waste pit, which is located in the northern portion of the BRL.

23. The parties have stipulated the weight, type, and percentage share of industrial waste ( by weight) disposed of at the BRL, as follows:

1. *Allegheny Ludlum*—2,185 equivalent tons of waste oil containing metals and volatile organic compounds—**5.13%**.

2. *Aristech*—638,000 to 643,000 gallons (3,230 equivalent tons) of maleic and phthalic anhydride and fumaric acid wastes containing chromium, lead, ammonium, copper, xylene, cyanide, iron, nickel, zinc and phenolic compounds—**7.58%**.

3. *Ashland*—78,000 gallons (533 equivalent tons) of maleic anhydride wastes containing chromium, ben-

---

7. Cravat and Puskarich formed Ohio Resources in the mid–1970s to assist in overseeing and performing the BRL's operation. Ohio Resources had the same officers and directors as Cravat.

zine, toluene, xylene, and cresol—1.25%.

4. *National Steel*—782 tons of oil/water and caustic acid cleaning solutions containing chromium—1.84%.

5. *Neville*—472,000 gallons (2,034 tons equivalent) wastewater treatment plant sludge containing at least benzine, toluene and trichloroethylene—4.78%.

6. *Beazer*—3,300 tons of maleic and phthalic anhydride wastes, para cresol, meta cresol and cresylic acid wastes, butanol, paraformaldehyde, and resorcinal wastes—7.75%.

7. *Pullman*—36 tons of waste filter paper, spent corncob de-bur media and containers with arsenic, barium, cadmium, chromium, and lead—.08%.

8. *SKF USA*—80,000 gallons (345 equivalent tons) waste tramp oil containing chromium, phosphorus, and phenol—.81%.

9. *Triangle*—21,987 tons of wastewater treatment sludge containing arsenic, barium, cadmium, chromium, lead, mercury, nickel, silver and zinc—51.61%.

10. *USX*—1,318 tons of waste oil containing benzine, toluene, and polyaromatic hydrocarbons ("PAHs")—3.09%.

11. *Wheeling–Pitt*—4,017 tons of wastewater treatment plant sludge containing cadmium, chromium and lead; 670,000 gallons (2,833 equivalent tons) of oil and water waste containing barium, chromium, lead, mercury, selenium, and silver—16.08%.

24. The industrial waste identified above was generated outside Belmont County. Unless produced in contiguous counties, the prior written approval of the Belmont County Board of Commissioners was required for it to be properly disposed of at the BRL. Belmont County records show that the only industrial waste that received the Board's prior approval for disposal at the BRL was the lime-neutralized sludge generated by Triangle.

2. **Municipal Waste**

25. Most of the waste disposed of at the BRL was Municipal Solid Waste ("MSW"). Between 755,000 and 955,000 tons of MSW were disposed of at the BRL from 1970 through 1991. When the BRL was operating, it was the exclusive site in Belmont County for the disposal of MSW. During that period, by the rule of the Board of Commissioners pursuant to Ohio Rev.Code § 343.01, all MSW generated within Belmont County was required to be disposed of at the BRL.

26. MSW and other solid wastes were typically disposed of at the BRL in large trenches excavated into the mining Gob.

27. About 35–40% of the MSW disposed of at the BRL was generated by customers who paid cash for the disposal, and who therefore cannot be identified from landfill records. Credit customers disposed of the remainder of the MSW at the BRL. Some of the BRL records are missing, however, and there is no reliable information concerning the precise quantity of MSW attributable to many of the identified MSW generators and transporters. Moreover, the specific types of waste attributable to the identifiable generators and transporters are not ascertainable.

28. Studies indicate that some components of MSW contain traces of hazardous substances.[8] MSW components that con-

---

8. The U.S. Environmental Protection Agency ("USEPA") defines MSW as "solid waste that is generated primarily by households, but that may include some contribution of wastes from commercial, institutional and industrial sources as well. Although the actual composition of such wastes varies considerably at individual sites, municipal solid waste is gen-

tain hazardous substances include some paint and paint thinners, household cleaning products, pesticides and insecticides, nail polish remover, and batteries. The parties have stipulated that at least some of the MSW at the BRL contains some of the hazardous substances found at the BRL. Nonetheless, despite extensive discovery, the parties are unable to determine whether any particular MSW attributable to any specific generator or transporter contained any particular hazardous substance.

29. The MSW contained some of the hazardous substances found in the soil, surface water, and groundwater of the BRL.

30. MSW transporters such as Miller Collection, Roger Tipton, and others did not select the BRL as the disposal site. Rather, the rules adopted by the Belmont County Board of Commissioners mandated that all solid waste they collected was to be disposed of at the BRL.

### 3. Gob

31. All Gob at the BRL site was deposited there by Consol's predecessor during the mine's operation from 1934 to 1954, before the BRL was operating as a landfill. As a result, a significant amount of Gob [9] is present over a much of the BRL.

32. The parties have stipulated that samples from Gob at the BRL indicate that the Gob contains arsenic, chromium, and lead. The parties also stipulate that the Gob contains some of the hazardous substances found at the BRL. In addition, the parties agree that when exposed to oxygen, the sulfur compounds in Gob may react with water to form acid mine drainage ("AMD"). The parties stipulate that AMD has occurred at the premises on which the BRL is located.

### D. Facts Specific to Neville's Waste

33. Since before November 1978, Neville has owned and operated a chemical manufacturing plant on Neville Island (Neville Township), Pennsylvania, at which products have been manufactured from by-products of petroleum and coal tar refining operations.

34. Between December 1, 1978, and February 28, 1979, chemical manufacturing at Neville's plant included production of hydrocarbon resins by heat and catalytic processes, production of chlorinated paraffins and hydrochloric acid, and the production of benzophenone and other products, as well as the sale and distribution of solvents and fuel oil. Neville's processes used various solvents, including toluene, 1,1,2,2–tetrachoroethane, chlorobenzine, and methylethylkeytone.

35. During that period, Neville's chemical manufacturing operations generated process wastewater containing various chemical constituents requiring treatment

---

erally composed of large volumes of non-hazardous substances (*e.g.,* yard waste, food waste, glass, and aluminum) and may contain small quantities of household hazardous waste (*e.g.,* pesticides and solvents)". *Announcement of and Request for Comment on Municipal Solid Waste Settlement Proposal,* 62 Fed.Reg. 37,231 at 37,231 (July 11, 1997).

9. In Triangle's trial brief, filed before Triangle settled with Consol, Triangle asserted that 10,000,000 tons of Gob were disposed of at the BRL. The Court does not find, however, that this amount has been proved by a pre-

ponderance of the evidence. In its proposed allocation, Neville treats Consol both as a landowner and a generator of hazardous waste disposed of at the BRL, assigns Consol a 5.6822% share based on amount and relative toxicity of the waste, along with all of the generators, including the generators of the MSW. Neville's purported expert opined that the BRL contained about 70,000 tons of Gob, exclusive of Gob underlying the BRL. The Court does not make a specific finding concerning the quantity of Gob present at the BRL, but finds that the amount is substantial.

in Neville's wastewater treatment plant before discharge into the Ohio River.

36. During this time, Neville's wastewater treatment process generated a lighter-than-water oily sludge, consisting of an emulsion of water, organic oily materials, and some inert solids.

37. In a letter dated November 20, 1978, Mays Corporation ("Mays") indicated to Neville that it was hauling industrial wastes from the USS Chemicals (now Aristech) facility on Neville Island, from Koppers (now Beazer), and Ashland Chemicals. Mays offered to haul Neville's "concentrated wastewater" for $.23 per gallon.

38. The parties stipulate that between December 1, 1978, and February 28, 1979, Neville hired Mays for the removal, transportation, and offsite disposal of the oily sludge from Neville's wastewater treatment facility.

39. The parties further stipulate that during that period, Mays disposed of 472,000 gallons, or 2,034 tons, of Neville's sludge at the waste pit area of the BRL.

40. The parties agree that Neville's sludge contained one or more hazardous substances, including but not necessarily limited to benzine, toluene, and/or trichloroethylene.

41. Neville has presented the opinion of purported expert Edward Sowinski to the effect that any hazardous substances initially present in Neville's sludge had dissipated naturally and degraded to the point that they would have been essentially gone by the time the Remedial Investigation ("RI")[10] was performed. Sowinski's opinion was based upon studies performed measuring the natural degradation of such hazardous substances in seawater and river water. The Court finds that Sowinski's opinion on this point is unreliable because the opinion fails to take into account the condition of the waste pit at the BRL, which was acidic, anaerobic, and contained numerous other substances. Sowinski's degradation theory also fails to explain the RI's finding that benzine and toluene were present in waste pit borings at levels significantly higher than those in Gob or Gob plus MSW, as well as in down-gradient groundwater wells, and that a benzine plume was emanating from the waste pit, even though the BRL had ceased accepting industrial wastes 1980, and the RI samples were taken from the BRL years later.[11]

42. The Court finds that Neville's watery sludge contained hazardous substances as defined in CERCLA § 101(14), 42 U.S.C. § 9601(14), both at the time it was disposed of at the BRL, and at the time of the RI.

### E. The CERCLA Process at the BRL

43. On December 7, 1978, OEPA scientist Jerry Roberts visited the BRL and talked to Mike Puskarich of Ohio Resources. In a December 10, 1978 letter to the Belmont County Health Department, Roberts noted that the BRL was receiving "various industrial wastes which may be classified as hazardous, toxic, liquid, or semi-solid." Roberts stated that the BRL was not approved to receive such wastes, and that it should cease receiving them. The Belmont County Health Commissioner sent a letter to Mike Puskarich on January 8, 1979, ordering the BRL to cease and desist receiving industrial wastes.

---

**10.** The remedial investigation report is the part of the site investigation that describes the nature and extent of chemical contamination at the site. *See* 40 C.F.R. § 300.430(d).

**11.** The RI indicates that waste pit boring samples were collected from the BRL in September 1987.

44. Several times thereafter, the OEPA recommended that the contents of the BRL waste pit be removed and disposed of at an approved facility. This was never done. Rather, in 1980, the waste pit was filled by pushing some of the sludge, gob, and soil into the impoundment. The waste pit was then covered with soil and garbage and seeded with grass.

45. During this period, the OEPA, in conjunction with the USEPA, investigated the BRL, focusing on the industrial wastes in the waste pit.

46. As a result of the investigation, on September 8, 1983, the USEPA placed the BRL on the National Priorities List of hazardous substance disposal sites (also referred to as Superfund sites).

47. In December 1984, the USEPA notified the following companies that the agency considered them PRPs: Cravat, Ashland, Beazer, Neville, Triangle, SKF, and Aristech. The federal EPA requested that these companies conduct a RI and feasibility study [12] ("RI/FS") to determine the nature and extent of contamination at the BRL.

48. In response to the USEPA's request, on October 31, 1985, Cravat, Ashland, Beazer, SKF, Triangle, and USX entered into an administrative order on consent ("AOC I"), requiring the cooperating PRPs to complete the RI/FS and the endangerment assessment [13] ("EA").

49. The AOC I PRPs retained Versar, Inc. ("Versar") to conduct the RI/FS and EA. The focus of the RI was on the "possible migration of hazardous substances present in the Waste Pit." The RI identified the presence of benzene, toluene, ethylbenzene, xylenes, chromium, and zinc as "potentially indicative of the Waste Pit, due to significantly higher concentrations compared to concentrations found in mine spoil [Gob] or mine spoil plus garbage." Versar concluded that the presence of these waste pit indicator chemicals in down-gradient groundwater wells "supports the hypothesis that contaminants may have moved some distance from the Waste Pit." Versar further concluded that migration of contaminants from the waste pit would require "permanently immobilizing contaminants in the Waste Pit and fill area via minimizing recharge to groundwater, and by controlling discharge of ground water to surface water."

50. The RI indicated a benzene contamination plume emanating from the waste pit. A brown oil with an odor typical of aromatic organic compounds was detected in all samples of the waste pit borings. Of the volatile organic compounds detected in the waste pit borings, the following six compounds represented 99% of such compounds: acetone, 1,1,1–trichloroethane, benzene, toluene, ethylbenzene, and xylenes.

51. Upon completion of the RI/FS, the USEPA issued its record of decision [14] ("ROD") on August 19, 1991. In selecting a remedy for the BRL site, the USEPA was required by statute to implement all applicable or relevant and appropriate federal and state requirements ("ARARs").

---

12. The feasibility study is the part of the site investigation that screens and evaluates potential remedial technologies that may be used at the site. The feasibility study is performed following completion and USEPA approval of the remedial investigation. *See* 40 CFR § 300.430(e).

13. The endangerment assessment is the part of the site investigation that assesses the threat a site poses to human health and the environment. The endangerment assessment is prepared in accordance with USEPA-issued guidance and policy.

14. The record of decision is the formal document the USEPA issues that outlines the remedial actions deemed necessary for a site, and the basis for the selected remedy. *See* 40 CFR § 300.

Due to the industrial and hazardous wastes disposed of in the waste pit, the landfill closure requirements of the Resource Conservation and Recovery Act ("RCRA")[15] constituted ARARs for the site. The USEPA determined, however, that construction of a RCRA hazardous waste landfill cap at the site would be technically impracticable, and that construction of a solid waste landfill cap in accordance with Ohio Administrative Code § 3745–27–11 would attain a standard of performance equivalent to a RCRA cap. The USEPA therefore invoked a statutory waiver of the RCRA ARARs, and selected a remedy that included the construction of a solid waste landfill cap meeting OEPA regulatory requirements. In addition to a 97–acre solid waste landfill cap, the selected remedy included groundwater and surface leachate seep collection, treatment, and monitoring. The ROD estimated the cost of the remedy to be about $48 million to $52 million.

52. After the USEPA issued the ROD, it notified additional PRPs of their potential liability. It also requested that the PRPs participate in the implementation of the remedy selected for the BRL and in the reimbursement of the USEPA's costs. The PRPs that received this notice included Consol and Neville.[16]

53. The USEPA and the cooperating PRPs, which did not include Neville, entered into a second administrative order on consent ("AOC II") on February 10, 1992, obligating them to conduct the work necessary to perform the pre-design studies required by the ROD, to prepare the remedial design for the EPA-selected remedy, and to pay the USEPA's oversight costs for the remedial design. At the time of the AOC II, the cooperating PRPs included all of the PRPs that entered the AOC I, as well as Allegheny Ludlum, Aristech, Consol, National Steel, Pullman, Mill Service, Shenango, Wheeling Sanitary Board, and Wheeling–Pitt.

54. On March 21, 1994, Consol filed a complaint for declaratory judgment in Case No. C2–94–248, against the United States Department of the Interior, USEPA, the Ohio Department of Natural Resources, Belmont County, Ohio and thirteen PRPs, including Triangle, to determine whether any effects of the pre-SMCRA coal mining activities at the site are covered by SMCRA,[17] and to determine liability and allocation of response costs under at the BRL under CERCLA.

55. On August 18, 1994, the United States filed a Complaint in Case No. C2–94–785 against Consolidation Coal Company, the Board of County Commissioners of Belmont County, and eleven other parties, including Triangle, for the recovery of the costs incurred by the U.S. and a declaration of the defendants' liability for future response costs.

56. On November 4, 1994, Magistrate Judge Abel ordered that Case C2–94–785 be consolidated before Magistrate Judge Kemp with Case C2–94–248 for pretrial purposes.

57. On January 20, 1995, ten of the defendants, including Triangle, filed a

---

15. 42 U.S.C. §§ 6901–6992k. RCRA was pre-CERCLA environmental legislation addressing the disposal of solid and hazardous wastes.

16. This was the first notice Consol received that the USEPA considered Consol a PRP. Neville had already received such notice in December 1984.

17. The previous District Judge to whom this case was assigned held that the Gob at the BRL site was subject to CERCLA, and that funds were not available from the Abandoned Mined Lands Reclamation program, 30 U.S.C. § 1231, to pay for remediation of the BRL Gob (Doc. 223 in Case No. C–2–94–248).

Third–Party Complaint for contribution against sixty-four third-party defendants, including Neville. The Third–Party Complaint was amended on April 7, 1995.

58. On October 16, 1995, Magistrate Judge Kemp issued a Status Conference Order consolidating the two cases and realigning the parties so that the sole plaintiff in both cases was the United States of America.

59. In the October 16, 1995 Status Conference Order, Magistrate Judge Kemp recognized the cooperating PRPs were in discussions with the USEPA concerning modifications to the remediation plan for the site and had made progress in those negotiations. In its Status Conference Order, the Court invited the Third–Party Defendants, including Neville, to participate in the negotiations with the United States and stated, "[a]ny third-party defendant who desires an update with respect to the status of these negotiations, or who would like to participate in such negotiations, should contact Mr. Lonardo, counsel for a number of the third-party plaintiffs, with such requests."

60. On March 7, 1995, the AOC II cooperating PRPs, including Triangle and Consol, submitted a revised remedial design concept to USEPA for the modification of the remedy as chosen in the ROD. The revised remedial design report was finalized in November of 1996.

61. In two separate agreements, in June 1996 and October 1996, the Group of Eight and Wheeling Pitt assigned their CERCLA contribution rights and claims to Consol.

62. On July 17, 1997, in response to the revised remedial design, USEPA granted an Explanation of Significant Differences [18] ("ESD") modifying its decision as to the chosen remediation alternative for the site.

63. The ESD memorialized USEPA's agreement to reevaluate the remedy chosen in the ROD. The reevaluation was prompted by the March 1995 proposal submitted by the cooperating PRPs.

64. In the ESD Affirmation of Statutory Determinations, USEPA stated that the revised remedy is protective of human health and the environment and is cost-effective.

65. It is estimated that the cost of the revised remedy is $25 million, or about one-half of the cost of the remedy chosen in the ROD.

66. The revised remedy reduced the size of the Ohio solid waste cap from 97 to 37 acres, covering only the northern section of the landfill, including the waste pit.

67. Concurrent with the issuance of the ROD, the cooperating PRPs entered a Consent Decree in this action providing for the performance of the remediation of the BRL site. At this time the cooperating PRPs were: Allegheny Ludlum, Aristech, Ashland, Beazer, Consol, National Steel, Pullman, SKF, Triangle, USX, Wheeling–Pitt, Cravat, Ohio Resources, and Belmont County.

68. The Court entered the Consent Decree on March 17, 1998. The Consent Decree expressly recognizes and preserves the CERCLA contribution rights of the signatories against all non-signatories, which includes Neville.

69. As of October 1999, the total past response costs at the BRL were $7,488,427.10.

**F. Neville's Lack of Cooperation**

**1. Non-cooperation during preliminary investigation phase**

70. Not later than January 1979, Neville knew its watery sludge, containing

---

**18.** The explanation of significant differences is a formal document the USEPA issues which explains how the revised remedy for the site differs from the remedy selected in the ROD.

hazardous substances, had been taken from its plant by a waste hauler, Mays Corporation, to a disposal site in St. Clairsville, Ohio. The BRL is located about four miles southeast of St. Clairsville. The BRL is the only such site in the vicinity of St. Clairsville and the only waste disposal site in Belmont County, Ohio.

71. On February 22, 1979, in response to concerns raised by the Pennsylvania Department of Environmental Resources, William Roper, Neville's vice president of manufacturing, wrote a letter to Assistant Attorney General Howard J. Wein, admitting that Neville's wastewater treatment sludge was "being hauled away by Mays Corporation to St. Clairsville, Ohio," the location of the BRL. The February 22, 1979 letter indicated that Mays had hauled thirty-eight loads of Neville's sludge to St. Clairsville from January 1, 1979 to February 16, 1979.

72. The February 22, 1979 letter from William Roper of Neville to the Assistant Attorney General for the Commonwealth of Pennsylvania attached a January 24, 1979 letter from Mays Corporation to Neville's Harvey B. Wheeler, indicating that Mays was disposing of Neville's waste at the "current surface site in St. Clairsville Ohio."

73. On January 20, 1983, Michael Moschell, an inspector for OEPA, wrote a letter to Neville requesting information on the wastes that Neville had arranged for Mays to haul to the BRL.

74. On March 8, 1983, William Roper of Neville wrote a letter responding to Moshell's letter from the OEPA. Roper's letter did not admit that Neville's waste was disposed of at the St. Clairsville site in Ohio, the location of the BRL. Rather, Roper indicated that its earlier response to the Pennsylvania Assistant Attorney General had been based on a mere "supposition" that Mays hauled the waste to the BRL.

75. The March 8, 1983 letter response from Neville to OEPA also failed to give OEPA information on the volume of the waste sent to the BRL, failed to provide OEPA with purchase orders between Neville and Mays, the shipping papers or invoices regarding the shipment of Neville's waste, or chemical data on the waste, even though these relevant documents previously had been provided by Neville to the Assistant Attorney General for the Commonwealth of Pennsylvania on February 22, 1979.

76. Neville did not cooperate with OEPA's request for information, and failed to provide relevant information which it had in its possession establishing that its waste had been disposed at the BRL.

77. The Court finds that Neville's March 8, 1983 letter to the OEPA was incomplete, evasive and untruthful.

78. On March 15, 1983, Moschell of OEPA again wrote a letter to Mr. Roper requesting that Neville continue to search its files for documents, requesting shipping papers and invoices, and indicating that Neville should have analytical data on their waste as required by the Resource Conservation and Recovery Act ("RCRA"). He further requested information on the chemical products Neville manufactured and the hazardous constituents Neville would expect in the waste as well as the chemical composition of the waste and all relevant documents.

79. Moschell's March 15, 1983 letter contains the following sentence: "Your co-operation in this matter is appreciated."[19]

19. As astounding as it may seem, Neville ac- tually relies on this statement as evidence of

The Court finds that the sentence is no more than a common expression used in business and legal correspondence indicating OEPA's sentiment that it is requiring Neville's cooperation in giving complete disclosure. Indeed, the Court finds it would be ludicrous to suggest that the sentence is evidence that Neville fully cooperated with OEPA in its efforts to identify hazardous substances disposed of at the BRL. Furthermore, Mr. Moschell did not know at that time that Neville had failed to disclose information in its possession.

80. On March 29, 1983, Neville's Roper responded to the March 15, 1983 letter from Mr. Moschell. Roper denied that Neville's waste was a RCRA hazardous waste. Roper also claimed that Neville was unable to identify the hazardous constituents in the waste or provide shipping papers, invoices, as Neville claimed it could not find them. Roper's March 29, 1983 letter did not provide information on the chemical products Neville manufactured, the hazardous constituents Neville would expect in the waste, or the chemical composition of the waste.

81. In sum, the Court finds that Neville failed to cooperate in the OEPA's preliminary investigation of the BRL site and provided answers to the OEPA's requests for information that were incomplete, evasive, and misleading.

## 2. Lack of Cooperation in CERCLA administrative process

82. On December 7, 1984, the USEPA sent Neville a letter, notifying Neville that it was a PRP for the remediation of the BRL and requesting Neville's participation in the remediation of the BRL.

83. On January 4, 1985, McKnight of Neville responded to USEPA's request, and refused to participate in the remediation of the BRL, claiming "Neville has never been involved in the generation, transportation, treatment or disposal of hazardous wastes [20] relative to the Buckeye Reclamation Landfill." Instead, Neville requested information from the USEPA to show that Neville had disposed of waste at the BRL.

84. Other PRPs who allegedly generated, transported, or disposed of waste or owned or operated the BRL, including Triangle and Consol, cooperated in the USEPA's request to study and remediate the site. Those PRPs formed the Buckeye Reclamation PRP Steering Committee, chaired by David B. Graham. Graham sent letters to McKnight of Neville inviting Neville to join the PRP group's effort to work with USEPA to remediate the BRL.

85. On June 27, 1985, McKnight of Neville sent a letter to David Graham in response to Graham's letters dated April 15, 1985, and June 14, 1985. In the letter he stated, "to the extent that any of the materials hauled by Mays at that time were disposed of at the Buckeye Reclamation Landfill, Neville must again advise that those materials were non-hazardous substances." Therefore, he claimed, Neville was not a PRP under CERCLA, and again he requested that Graham provide to Neville pertinent documents which could be used to prove Neville's liability. Neville did not join with the PRPs who did cooperate with USEPA and OEPA in studying and remediating the site.

---

cooperation. *See* Neville's Proposed Findings of Fact and Conclusions of Law (Doc. 515 in Case No. C–2–94–248; Doc. 439 in Case No. C–2–94–785) at 61. Neville's specious assertion on this point typifies the approach it has taken toward this matter since the beginning.

**20.** CERCLA liability does not require the disposal of hazardous "waste", but only hazardous "substances" in a waste. 42 U.S.C. §§ 9607(a), 9601(14).

86. On July 26, 1985, Mr. Graham responded to McKnight's request for documents and invited Mr. McKnight to meet with representatives of two cooperating PRPs, Mr. Hayes of Koppers Company (Beazer East) and Mr. Todd of U.S. Steel.

87. On September 9, 1985, McKnight responded confirming that he had met with Hayes and Todd, denied that Neville was a liable party, and declined the PRPs' "invitation to participate in the Buckeye Steering Committee for purposes of dealing with the USEPA."

88. Although it was requested to do so, Neville failed and refused to participate in the AOC I, under which the cooperating PRPs agreed to undertake the RI/FS and the EA.

89. The cooperating PRPs incurred $3,727,180 in direct expenses for the preparation of the RI/FS and EA. Neville did not participate in this effort and contributed nothing.

90. On February 21, 1986, Graham sent a letter to McKnight of Neville informing Neville that the cooperating parties had entered into the AOC I with USEPA and OEPA to perform the RI/FS for the site, and reminding McKnight that the USEPA identified Neville as a PRP at the site. Graham requested that Neville participate in the investigation of the landfill and pay an equitable allocation of the costs incurred. He invited Neville to participate in a meeting to discuss these matters with the cooperating PRPs.

91. Although it had been requested to do so, Neville failed and refused to participate in the AOC II, under which the cooperating PRPs agreed to pay for the remedial design for the BRL site.

92. The cooperating PRPs incurred direct costs for the preparation of the remedial design studies in the amount of $3,245,571. Triangle paid a share of these costs in the amount of $582,252. Neville did not participate or contribute to the effort.

93. On March 31, 1993, Michael Berman of USEPA sent a letter to Neville pursuant to Section 104(e) of CERCLA, requesting supplemental information regarding the nature and quantity of Neville's waste.

94. On April 26, 1993, McKnight of Neville objected to USEPA's letter requesting information. McKnight indicated he did not know the amount of Neville's waste Mays hauled or the location and identity of the disposal site.

95. The Court finds that, with the information available to Neville prior to its 1983 correspondence with OEPA and its 1985 correspondence with USEPA, it is impossible to believe that Neville did not know or could not reasonably ascertain that Mays disposed of Neville's sludge at the BRL site, and that the sludge contained hazardous substances.

96. Neville did not cooperate with USEPA's request for information and gave answers that were incomplete, evasive, and misleading. Neville failed to provide USEPA with documents and information in its possession indicating that Mays had hauled Neville's waste, which contained hazardous substances, to the BRL.

### 3. Non-cooperation in CERCLA lawsuits

97. Neville did not accept the Court's invitation in October 1995 to participate with the cooperating PRPs in its negotiation of the remedy for the site with the United States. These negotiations led to the selection of a remedy with a cost of about $25 million, compared to the remedy selected in the ROD, which was estimated to cost at least $48 million.

98. In Neville's "Answers and Objections of Third–Party Defendant Neville Chemical Company to Allegheny Ludlum

Corporation's Interrogatories and Requests for Production of Documents," dated August 8, 1995, Neville swore, as verified by McKnight, that it did not transport or arrange with a transporter for the disposal of any materials either hazardous or non-hazardous at the BRL. The Court finds that this answer was untruthful.

99. In Neville's "Answers and Objections of Third–Party Defendant Neville Chemical Company to Allegheny Ludlum Corporation's Interrogatories and Requests for Production of Documents," dated August 8, 1995, Neville did not admit that Mays had any contractual relationship with Neville during the years 1969–1992, but rather stated that Neville "may" have had a contractual relationship with Mays Corporation during the years 1978 and/or 1979. Neville attempts to redeem its answer, arguing that the term "contractual" requires a legal conclusion. The Court, however, finds that its answer was evasive and untruthful.

100. Neville did not participate in the effort between the cooperating PRPs and USEPA in the negotiation of the ESD.

101. On March 17, 1998, the Court entered the Consent Decree between the United States, Consol, Triangle, and the other cooperating PRPs, but not Neville, for the remediation of the BRL site estimated at $25 million, and the payment of USEPA's future costs in excess of $300,000.

102. The parties to the Consent Decree paid oversight costs to USEPA and OEPA in 1998 in the amount of $232,883. Neville did not participate in the Consent Decree and consequently has paid nothing.

### III. General Principles Applicable to CERCLA

### A. Purpose of CERCLA

■ Congress enacted CERCLA in 1980 " 'to facilitate the prompt cleanup of hazardous waste sites by placing the ulti-mate financial responsibility for cleanup on those responsible for hazardous wastes.' " *Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 652 (6th Cir.2000)(quoting *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir.1999)); *see also B.F. Goodrich v. Betkoski*, 99 F.3d 505, 514 (2d Cir.1996) (noting that the purposes of CERCLA include "facilitating efficient responses to environmental harm, holding responsible parties liable for the costs of the cleanup, and encouraging settlements that reduce the inefficient expenditure of public funds on lengthy litigation" (citation omitted)), *cert. denied*, 524 U.S. 926, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998).

■ CERCLA is not a model of legislative clarity. *See, e.g., Exxon Corp. v. Hunt*, 475 U.S. 355, 363, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986); *Artesian Water Co. v. Gov't of New Castle County*, 851 F.2d 643, 648 (3rd Cir.1988) ( "CERCLA is not a paradigm of clarity or precision. It has been criticized frequently for inartful drafting and numerous ambiguities attributable to its precipitous passage."). As it is a remedial statute, CERCLA must be construed liberally to effectuate its primary goals. *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 327 (2d Cir.), *cert. denied*, 531 U.S. 979, 121 S.Ct. 427, 148 L.Ed.2d 436 (2000).

### B. Liability under CERCLA

■ CERCLA provides two causes of action: one for recovery of response costs under § 107(a), and one for contribution under § 113(f)(1). Section 107(a) provides:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(I) of this title.

42 U.S.C. § 9607(a). Liability under § 107(a) is generally joint and several on any defendant regardless of fault. *Kalamazoo River Study Group*, 228 F.3d at 653.

■ " 'To establish a prima facie case for cost recovery under § 107(a), a plaintiff must prove four elements: (1) the site is a 'facility'; (2) a release or threatened release of hazardous substance has occurred; (3) the release has caused the plaintiff to incur 'necessary costs of response'; and (4) the defendant falls within one of the four categories of PRPs.' " *Id.* (quoting *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 347–48 (6th Cir.1998)). CERCLA defines a "facility" as including "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located...." 42 U.S.C. § 9601(9). CERCLA defines a "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)...." 42 U.S.C. § 9601(22).

■ In 1986 Congress created the second CERCLA cause of action when it enacted the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), which allows PRPs to seek contribution from other PRPs for their proportionate share of costs associated with hazardous waste cleanup. *Centerior*, 153 F.3d at 348–56. Before the 1986 amendment, PRPs were deemed ineligible to bring recovery actions under § 107(a). *Id.* at 349, 356. Section 113(f)(1) states in relevant part:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by

Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

42 U.S.C. § 9613(f)(1). Parties seeking contribution under § 113 must look to § 107 for the basis and elements of the liability of the defendants. *Kalamazoo River Study Group*, 228 F.3d at 653. That is, the elements for a contribution claim under § 113 are identical to those for a § 107 claim. *Id.* at 656. Notably, causation is *not* an element of liability under either § 107 or § 113. *Id.; AlliedSignal, Inc. v. Amcast Int'l Corp.*, 177 F.Supp.2d 713, 748–49 (S.D.Ohio 2001)(Rice, Chief Judge).

██ Unlike § 107, liability under § 113 is not joint and several, but several only. *Kalamazoo River Study*, 228 F.3d at 653; *Centerior*, 153 F.3d at 348. PRPs who settle with the government may bring contribution actions under § 113, but are themselves immune from claims for contribution concerning matters covered by the settlement. 42 U.S.C. § 9613(f)(2); *see Centerior*, 153 F.3d at 352, n. 11.

### C. Equitable Allocation of Response Costs

Congress invested the district courts with broad discretion in making CERCLA contribution allocations when it provided, "the court may allocate response costs among the liable parties using *such equitable factors as the court determines are appropriate.*" 42 U.S.C. § 9613(f)(1)(emphasis added); *see Kalamazoo River*

*Study Group v. Rockwell Int'l Corp.*, 274 F.3d 1043, 1049 (6th Cir.2001). By using the term "equitable factors" Congress invoked the tradition of equity under which the court must construct a flexible decree balancing all the equities in the light of the totality of the circumstances. *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 572 (6th Cir.1991). "It is well established that flexibility is proper in the successful shaping ... of an equitable decree." *United States v. City of Birmingham, Mich.*, 727 F.2d 560, 566 (6th Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

Many courts determining allocation have consulted the six so-called "Gore factors":

(I) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

(ii) the amount of the hazardous waste involved;

(iii) the degree of toxicity of the hazardous waste involved;

(iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

(v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(vi) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

126 Cong. Rec. 26,779, 26,781 (1980). *See also* H.R. Rep. 99–253, at 19 (1985), *reprinted in* 1986 U.S.C.C.A.N. 3042. The Court is by no means required to apply the Gore factors[21]. Indeed, as the Seventh

---

**21.** Use of the Gore factors is not required for at least two reasons. First, the plain language of § 113 provides that the Court may

consider "such factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). Second, the Gore factors were

Circuit Court of Appeals has stated, "in any given case, a court may consider several factors, a few factors, or only one determining factor ... depending on the totality of the circumstances presented to the court." *Envtl. Trans. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 509 (7th Cir. 1992). One court has distilled the following four "critical factors":

1. The extent to which cleanup costs are attributable to wastes for which a party is responsible.
2. The party's level of culpability.
3. The degree to which the party benefitted from disposal of the waste.
4. The party's ability to pay its share of the cost.

*United States v. Davis*, 31 F.Supp.2d 45, 63 (D.R.I.1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001); Robert P. Dahlquist, *Making Sense of Superfund Allocation Decisions: The Rough Justice of Negotiated and Litigated Allocations*, 31 Envtl. L. Rep. 11098, 11099 (2001)("The Gore factors are most relevant in academic and theoretical analysis of the way Superfund liabilities should be allocated. But in the real world Judge Torre's list of four critical factors often provides the basis upon which Superfund allocations are made.").

Mathematical precision in this process is not realistically achievable or desirable. *R.W. Meyer, Inc.* 932 F.2d at 573–74 (flexible apportionment approach furthers congressional intent of prompt cleanup by ensuring that participating PRPs may seek contribution from other PRPs "without fear that their contribution actions will be bogged down by the impossibility of making meticulous factual determinations as to the causal contribution of each party."); *Davis*, 31 F.Supp.2d at 63.

 A plaintiff seeking contribution bears the burden of establishing the defendant's equitable share of response costs. *Centerior*, 153 F.3d at 348. Allocation under § 113 may include apportionment of any "orphan shares" [22] among the parties, representing shares attributable to PRPs that are insolvent. *See Centerior*, 153 F.3d at 354 n. 12.

## IV. Conclusions of Law

### A. Liability of Neville

 1. The Court has jurisdiction in this case because the action arises under the laws of the United States, *viz.*, CERCLA. 28 U.S.C. § 1331.

2. The parties have stipulated that the BRL site is a "facility" for purposes of CERCLA. Thus the first element for liability is satisfied. *Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 653 (6th Cir.2000).

3. The parties have stipulated that a release or threatened release of hazardous

---

considered by Congress but were not included in the final bill. *See R.W. Meyer*, 932 F.2d at 576 (concurring opinion by Guy, J.); Robert P. Dahlquist, *Making Sense of Superfund Allocation Decisions: The Rough Justice of Negotiated and Litigated Allocations*, 31 Envtl. L. Rep. 11098, 11099 (2001)("Dahlquist"). Other factors courts have considered include: "(1) the costs caused by the conduct of each party; (2) the benefits received from using a particular waste disposal practice; (3) the parties' knowledge of, and acquiescence in, the activities that caused contamination; (4) whether a property owner acquired the property at a reduced price; (5) whether the property owner purchased the property with knowledge of its contaminated condition; (6) whether the property owner may benefit from an increased property value following the remediation; (7) the parties' financial resources; (8) the existence of any indemnity agreements; and (9) the existence of any agency relationship among the parties." Dahlquist at 11099.

22. "Orphan shares are response costs attributable to insolvent or defunct PRPs at a site, which are unable to be recovered." *Centerior*, 153 F.3d at 354 n. 12.

substances has occurred at the BRL. The second element for liability is therefore satisfied. *Id.*

4. The parties have stipulated that Consol has and will be required to incur necessary response costs for the BRL consistent with the National Contingency Plan. The third element for liability is met. *Id.*

5. The only essential element of liability in question in this case is whether Neville is a responsible party under one of the four categories set forth in CERCLA § 107(a), 42 U.S.C. § 9607(a). *Id.*

6. Neville argues that it is not liable because Neville did not itself cause incurrence of response costs at the BRL. Neville's argument is unavailing because causation is not an element of liability under CERCLA. *Kalamazoo River Study Group,* 228 F.3d at 655–56.

7. Neville arranged for the disposal of hazardous substances at the BRL. Neville therefore fits within the category of a liable party under CERCLA § 107(a)(3). *See* 42 U.S.C. § 9607(a).

**B. Allocation of BRL Response Costs**

8. Consol and Triangle do not attempt to allocate shares of response costs to all of the PRPs, deeming it unnecessary because the Court need only determine Neville's share. In their proposed findings and conclusions, Consol and Triangle list a number of suggested equitable factors and then declare a suggested percentage allocation for Neville. They make no attempt whatsoever to account for the role of any of the other PRPs, other than to argue

that the MSW represents an orphan share. The Court understands that the approach Consol and Triangle advocate is within the Court's discretion to adopt and apply. Nevertheless, the Court finds that a fair and equitable allocation of Neville's share of response costs in this case can be achieved only if Neville's role as a PRP is compared to that of the other PRPs. The Court will therefore determine relevant equitable factors and apply them to all of the PRPs in this case.

9. The Court finds that culpability, the second of the four critical equitable factors identified by Judge Torre in *Davis,* 31 F.Supp.2d at 63, provides significant guidance in this case.[23]

10. Although the Court determines that culpability is the most significant factor in this case, the Court will consider other factors, including at least two of the Gore factors, namely, the amount of waste and cooperation with government.

11. The PRPs in this case fall within readily identifiable groups, the relative culpability of which is identifiable in accordance with equitable principles. The application of the culpability factor is reliable because, as a fact finder, the Court is able to articulate a rational and principled basis for distinguishing among the parties on this basis. The culpability factor is both reliable and fair inasmuch as Anglo–American courts, in both law and equity, have for centuries relied on levels of culpability to distinguish among and establish categories of wrongdoing and liability, and to determine entitlement to remedies.[24]

---

**23.** The four Torre factors are:
1. The extent to which cleanup costs are attributable to wastes for which a party is responsible.
2. The party's level of culpability.
3. The degree to which the party benefitted from disposal of the waste.
4. The party's ability to pay its share of the cost.

*Id.*

**24.** The concept of distinctions between acts on the basis of culpability can be traced at least as far back as Aristotle. *See* L.A. Zaibert, *Intentionality, Voluntariness, and Culpability: a Historical and Philosophical Analysis,* 1 Buff.Crim. L.Rev. 459, 466–73 (1998).

12. The Court finds that culpability provides a more reliable and fair basis than the first Torre factor, which examines cleanup costs attributable to each party's waste, in the unique circumstances this case presents. This case involves the distinct impacts of at least three categories of waste at the BRL: industrial waste, MSW, and Gob. The nature of the remedy ultimately selected provides an interrelated solution for all three different categories. The presence of Gob alone would have required at least some remedy bearing some similarity to the one being pursued, even though the evidence suggests it may have cost substantially less. The same is true of the MSW. Most of the industrial waste at the BRL is located in a relatively small, one-acre area known as the waste pit, and, admittedly, the selected remedy covers a much greater area. Arguably, the industrial generators should be allocated only a small portion of the response costs since the cost of the remedy as it relates solely to the area of the waste pit is presumably a fraction of the overall cost. The Court finds, however, that to diminish the industrial generators' share on this basis would be manifestly unfair, because but for the presence of the industrial waste, the BRL would ever have been designated a CERCLA superfund site in the first place. In short, the circumstances this case presents, lead the Court to find that there is no fair or reliable basis to ascribe a particular portion of the cost of cleanup to any particular individual PRP or category of PRPs. Rather, the presence of each of the different kinds of waste at the BRL together led to selected remedy and the total costs thereof. The Court therefore declines to apportion responsibility on the basis of the first Torre factor.

13. The Court finds that although they benefitted in different ways, all of the PRPs benefitted to roughly the same degree from the disposal of waste at the BRL. It appears that no one got rich as a result of the disposal of waste at the BRL. All generators, from industrial to MSW, benefitted as a result of the cheap disposal of their waste at the BRL. All transporters were able to engage in their business as a result of hauling waste to the site. The operators likewise were able to conduct a business. The owner during the lease period, Consol, had the benefit of nominal rent on what was otherwise useless property at the time. The Court finds that to the extent any PRP benefitted somewhat more or less than another, the comparison of the different degrees of benefit do not reflect a fair basis upon which to determine allocation of response costs. In this vein, the Court specifically rejects Consol's argument that Neville received a disproportionately large benefit from the disposal of its waste at the BRL, whereas other parties, such as the BRL operators, received little or no benefit. In sum, PRPs' equitable shares are not enhanced or diminished as a result of the third Torre critical factor.

14. The Court finds that the record evidence is insufficient to determine the relative abilities of PRPs to pay their shares of cleanup costs. The fourth Torre factor is therefore not a fair or reliable basis for allocation.

15. Returning to culpability, the Court finds that the relative levels of culpability of the following groups of PRPs can be determined fairly and equitably for purposes of allocation: (1) industrial generators and transporters of industrial waste; (2) owners and operators of the BRL; (3) Consol as the generator of the Gob; and, (4) generators and transporters of the MSW.

16. Of the above four categories of PRPs, the industrial generators and transporters are by far the most culpable. They knew, or should have known, of the

presence of the hazardous substances in their waste. Furthermore, with the exception of Triangle, none of the industrial generators or transporters obtained the prior approval of the Belmont County Board of Commissioners before disposing of the waste at the BRL. The industrial generators and the transporters knew, or should have known, that the disposal of their wastes at the BRL was unauthorized. The malfeasance or misfeasance of the industrial generators and transporters made the BRL a CERCLA site.

■ 17. Based upon these considerations, the Court finds that the largest share of costs should be allocated to the industrial generators and the transporters of the industrial wastes. The Court determines that the fair and equitable collective share of the industrial generators and transporters, including Neville, is 60% of past and future response costs.

■ 18. The owners and operators of the BRL are culpable to a somewhat lesser extent. They were not in as good a position to fully appreciate the hazardous nature of each kind of waste disposed of at the BRL, but they certainly could have done more to ensure that industrial wastes were not disposed of there. The culpability of the individual PRPs within this category varies. For example, if required to do so, the Court would find the culpability of Cravat and Ohio Resources, which operated the BRL on a day-to-day basis, to be greater than that of Belmont County, which merely exercised administrative oversight. Nonetheless, at the very least, Cravat/Ohio Resources and Consol bear some responsibility.[25] Cravat and Ohio Resources could have and should have

abided by the rules adopted by the Belmont County Board of Commissioners, which included restrictions on wastes that could be disposed of at the BRL. The original landowner, Consol, was aware of the purpose for which its land was going to be used, and is, therefore, responsible for helping set this entire process in motion. For purposes of this proceeding, however, such distinctions are unnecessary. Rather, determining the culpability of this category as a whole provides a sufficient basis for comparison so as to arrive at an equitable allocation of Neville's share. The Court determines that the fair and equitable collective share of response costs attributable to the owners and operators collectively is 25% of the past and future response costs.

■ 19. The Court concludes that Consol is liable as a generator for its Gob under CERCLA § 107(a)(3). Consol argues that these circumstances cannot fall within the statutory definition of arranger liability, because § 107(a)(3) requires that the hazardous substance be owned or possessed by the arranger and that the facility be owned by a third party. These requirements, it argues, cannot be simultaneously fulfilled in this case. *See* 42 U.S.C. § 9607(a)(3). For the following reasons, the Court rejects this argument, and finds that each of the elements of arranger liability is satisfied with respect to Consol's Gob.

20. First, the Court notes that the language of CERCLA § 107(a)(3) does not require the third-party recipient of the hazardous substance to be the owner of the facility. Rather, the statute imposes

**25.** The Court does not reach whether Belmont County is liable as an operator under CERCLA § 107(a)(2). The total allocation to the owner/operator group would be the same regardless of Belmont County's liability; if Belmont County was an operator, then a

share of the responsibility for the BRL would be shifted to it from Cravat/Ohio Resources. If Belmont County was not an operator, then the same share simply remains with Cravat/Ohio Resources.

liability if the facility is "owned *or operated* by another party." 42 U.S.C. § 9607(a)(3) (emphasis added).

21. The requirements of § 107(a)(3)c apply to Consol as follows: "Any person [Consol] who by contract [the lease and/or sale of the site] ... arranged for disposal ... of hazardous substances [contained in the Gob] owned ... by such person, by any other party [Cravat/Ohio Resources] ..., at any facility [the BRL] ... operated by another party [Cravat/Ohio Resources] ... and containing such hazardous substances." 42 U.S.C. § 9607(a)(3).

22. The parties have stipulated that Gob contains hazardous substances that are present at the BRL. It is undisputed that Consol owned the Gob.

23. The parties have stipulated that the BRL is a facility.

24. Cravat and Ohio Resources are "another party" that "operated" the BRL facility.

25. Throughout the relevant period, Cravat and Ohio Resources actively disposed of the Gob: the Gob was excavated to create trenches for the disposal of other waste; the Gob was mixed with other waste in the trenches, and the Gob was used as cover for other waste. *See Kaiser Aluminum v. Catellus Dev. Corp.*, 976 F.2d 1338, 1342 (9th Cir.1992)(excavation and spreading of hazardous waste within a site deemed to be disposal under § 101(29)).

26. The lease and the later agreement for the sale of the premises satisfy the agreement element of § 107(a)(3). With respect to the sale of the premises, it is noteworthy that Consol confirmed in a later memorandum that a primary motivation for the sale was to avoid potential liability for the Gob.[26] This underscores that Consol intended the agreement to be an arrangement for the continued disposal of the Gob. It also tends to show that Consol was aware the Gob contained hazardous substances. In sum, the Court finds that Consol may be held liable as an arranger under § 107(a)(3).

27. In the alternative, Consol also may be held liable as a transporter of its Gob under CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4). *Kaiser Aluminum*, 976 F.2d at 1343 (stating that on-site dispersal of hazardous material to uncontaminated area of the property falls within the scope of transportation under CERCLA § 107(a)(4)).

28. Having determined that Consol could be held liable for Gob disposed of at the BRL, the Court will proceed to allocate a share of response costs to Consol on that basis. The Court determines that the following equitable factors apply. As noted above, the evidence tends to show that Consol was aware that the Gob contained hazardous substances. At the very least, like the industrial generators, Consol was in the best position to understand and appreciate the presence of hazardous substances in the Gob. Nonetheless, Consol's level of culpability for disposal of Gob at the BRL is adjusted downward somewhat on the basis that the Gob was originally deposited at the site during the mining operations of Consol's predecessor, from 1934 to 1954, during which time there were

**26.** The Court is aware of several of cases in which courts have held that products were not waste for purposes of CERCLA or that sales were not disposal. *See, e.g., 3550 Stevens Creek Assoc. v. Barclays Bank*, 915 F.2d 1355 (9th Cir.1990), *cert. denied*, 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991); *Dayton Indep. School Dist. v. U.S. Mineral Products Co.*, 906 F.2d 1059 (5th Cir.1990); *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313 (11th Cir.1990). These cases, however, involved products that were produced as the producers' principal business products, not by-products that the producers had to get rid of.

no laws or rules prohibiting such disposal. Similarly, when Consol arranged for Cravat/Ohio Resources to dispose of the Gob at the BRL, the disposal was not in contravention of any law or rule established by the Belmont County Board of Commissioners. In contrast, with the exception of Triangle's waste, the waste of the industrial generators was disposed of at the BRL in violation of rules established by Belmont County. Hence, the Court ranks Consol's culpability as a generator somewhat lower than that of the industrial generators.

29. The Court has found that no particular quantity of Gob has been proven, although it is clear that the quantity of gob at the BRL is substantial.

30. Taking into consideration the level of Consol's culpability, and the substantial amount of Gob disposed of at the BRL, the Court determines that the fair and equitable collective share of response costs attributable to Consol for its Gob is 10% of the past and future response costs.

31. The fourth category of PRPs includes the generators and transporters of MSW. The Court finds that this category of PRPs is the least culpable. The members of this group had little or no knowledge that the MSW contained hazardous substances. Furthermore, the members of this category had no choice but to dispose of the MSW at the BRL. Nonetheless, it is undisputed that the generators and transporters of the MSW disposed of waste at the BRL, and that the MSW contained hazardous substances.

32. The Court determines that the fair and equitable collective share of response costs attributable to MSW generators and transporters is 5% of the past and future response costs at the BRL.

33. Consol argues that the generators of the MSW cannot be held liable, that 35–40% of the MSW cannot be attributed to any particular generator, and that several of the transporters are insolvent. On this basis, Consol asserts that any share for MSW must be deemed an orphan share, and therefore re-allocated among all of the solvent parties. *See Centerior* 153 F.3d at 354 n. 12.

34. The Court finds that it would be unfair to re-allocate any orphan share for all or part of the MSW among all of the solvent parties. Specifically, it would be unfair for the industrial generators to bear the burden of any orphan share because the disposal of MSW at the BRL was largely unrelated to the disposal of industrial waste. As indicated above, the industrial waste was disposed of in a one-acre area of the BRL known as the waste pit. In contrast, MSW was disposed of in large trenches throughout the 50–60 acres of the BRL.

35. The Court finds, however, that it would be fair to re-allocate any MSW orphan share to the owners and operators of the BRL. The owners supplied the land for the BRL fully aware of its intended use as a solid waste disposal facility. The operators received, handled, and disposed of the MSW on a day-to-day basis.

36. Inasmuch as any MSW orphan share would be re-allocated to the owners and operators, the determination of any MSW orphan share would not affect the allocation to the industrial generators and transporters, including Neville. The Court therefore declines to reach whether all or part of the share allocated for the MSW should be deemed an orphan share.

37. Having determined the collective shares of the four categories of PRPs, the Court will next determine Neville's share. The Court finds the evidence of relative toxicity is not sufficiently reliable in this case to be a fair basis for determining the industrial generators' individual shares. *See Akzo Nobel Coatings, Inc. v. Aigner Corp.,* 197 F.3d 302, 304–05 (7th Cir.1999)(opinion by Easterbrook, J.)(ex-

plaining inherent impracticality of "toxicity" as a basis for allocation). As noted above, however, the industrial generators have stipulated the amounts, in tons, of waste disposed of at the BRL. The Court finds that percentage weight is a fair and reliable basis for determining the individual shares of the industrial generators. Neville disposed of 472,000 gallons (2,034 tons equivalent) wastewater treatment plant sludge at the BRL, representing 4.78% of the total tonnage of industrial waste at the BRL.

38. As the Court observed above, Triangle was the only industrial generator that sought prior approval of the Belmont County Board of Commissioners before disposing of its waste at the BRL. As a result, Triangle's culpability is somewhat less than that of the other industrial generators, including Neville. Mathematical precision is impossible in making an adjustment for this factor. Nonetheless, the Court finds that rounding Neville's relative share as one of the industrial generators up to 5% fairly reflects the difference in culpability.

39. The category, however, does not consist only of industrial generators. It also includes the transporters of the industrial waste. Neville argues that if it is found liable, at most it should be allocated a share representing 50% of its waste, with the other 50% allocated the transporter of its waste, Mays.

40. Mays also transported the industrial waste of Beazer, Aristech and Ashland.

41. Consol avers that Mays is "now defunct" and seems to suggest that an orphan share should therefore the allocated to Neville. Neville argues that Consol has failed to adduce any evidence that Mays is insolvent. Neville is incorrect.

Consol submits the deposition testimony of Mays' owner, Robert Mays, in which he states that Mays Corporation has been inoperative since 1982, that the DER would not license it, and that it was liquidated. Robert Mays further stated that Mays has no assets.[27]

42. The Court finds by a preponderance of the evidence that Mays is insolvent. The Court concludes that Mays' share for hauling Neville's sludge constitutes an orphan share that should be attributed to Neville.

43. As a category, the industrial generators and transporters together are collectively deemed responsible for 60% of the past and future response costs at the BRL. The Court has determined that Neville's share as compared to the group of industrial generators, including Triangle, is 5%. Therefore, Neville's net share of costs for the past and future cleanup costs based on the equitable factors considered thus far, as among all of the PRPs, is 3%.

44. The Court finds that one additional equitable factor must be considered in determining Neville's share: cooperation with the government. Consol and Triangle argue that Neville's share should be adjusted upward—doubled or even tripled—based upon Neville's lack of cooperation throughout the CERCLA process.

45. The sixth Gore factor examines "the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment." 126 Cong. Rec. 26,779, 26,781 (1980); see also H.R.Rep. No. 99–253 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 3042.

---

**27.** Neville submits a November 20, 1978 letter from Mays to Neville indicating that Mays had recently upgraded its insurance coverage to $1 million. Neville offers no evidence that

such a policy was actually in force, however, or that the alleged policy would have covered Mays' illegal disposal of industrial wastes at the BRL.

46. The "degree of cooperation with government officials to prevent any harm to the public health or the environment is very important in the contribution analysis." *Central Maine Power Co. v. F.J. O'Connor Co.*, 838 F.Supp. 641, 646 (D.Me.1993). "A major concern of Congress in enacting SARA was to effectuate quick and efficient clean-ups in part by providing incentives for settlements with the government while also assuring that liable parties could seek restitution from other liable parties." *Id.* at 646. Congress also was concerned about the issue of fairness and the courts' ability to equitably apportion damages to those that assisted in the cleanup. *Id.* Consequently, the "cooperation factor" encourages cooperation with the government and promotes fairness, thus advancing CERCLA's goal of voluntary compliance and efficacious cleanups. *Id.*

47. More than any other factor, cooperation touches directly upon CERCLA's objective of prompt cleanup at the expense of responsible parties. With cooperation the goal is realized; without cooperation the goal is thwarted.

48. Neville failed to cooperate with OEPA in that it did not provide information in its knowledge and possession demonstrating that its waste from its Neville Island plant contained hazardous substances and that the waste was transported by Mays and disposed of at the BRL.

49. Neville failed to cooperate with USEPA in that it did not provide information in its knowledge and possession demonstrating that its waste from its Neville Island plant contained hazardous substances and that the waste was transported by Mays and disposed of at the BRL.

50. Neville did not join the BRL PRP Group to participate in the joint effort of the PRPs to cooperate with OEPA and USEPA to investigate and remediate the BRL to prevent harm to the public health and environment.

51. Neville was not a signatory to AOC I or AOC II which provided for the investigation and design of the remedy at the BRL to prevent harm to the public health and the environment.

52. Neville refused to join the Consent Decree in this action for the performance of the remedy at the BRL to prevent harm to the public health and the environment.

53. Neville failed to share in the common effort of the cooperating PRPs to respond to USEPA's request that the PRPs perform the remedy at the BRL.

54. Neville has failed to pay or contribute anything to the effort to prevent harm to the public health and the environment at the BRL.

55. The Court finds that Neville did not meaningfully cooperate in any phase of the CERCLA process in this case, although it was given ample opportunity to do so. To the contrary, Neville refused to cooperate throughout the process.

56. Boiled down to its essence, Neville's proffered reason for not cooperating in the process is very simply that it was not absolutely certain that Mays hauled its watery sludge to the BRL for disposal, and that it was not absolutely certain that its watery sludge contained hazardous substances as defined by CERCLA. The Court finds that, at all relevant times, Neville possessed information, and could readily have determined from this information or could have verified through minimal investigation, that, more likely than not, Mays had disposed of Neville's sludge at the BRL site. Similarly, at all relevant times, having created the process that produced its sludge, Neville has been in the best position to determine that, more likely than not, its watery sludge contained hazardous substances.

57. The Court finds that Neville's purported lack of absolute certainty does not explain, let alone excuse, its conduct in this matter. The Court finds that Neville's purported lack of certainty as to these matters could not have been genuine, but rather was a calculated attempt to frustrate every phase of the CERCLA process to avoid or at least delay liability.

58. The Court rejects Neville's argument that enhancement of a PRP's share of response costs is limited to cases in which the PRP fraudulently concealed evidence, or failed completely to respond at all to the USEPA's requests for information. The application of equitable factors is not so inflexible as to limit this Court's discretion to apply them in factual scenarios not contemplated in earlier decisions by other courts. The Court concludes that Neville's longstanding and stubborn refusal to cooperate merits application of the sixth Gore factor.

59. The Court also rejects Neville's assertion that its failure to provide complete and accurate information is excused because some of the information sought was eventually provided by Mays. The USEPA and OEPA, as well as the parties in this action, were entitled to the information from Neville in the first instance, if for no other reason than to confirm and cross-check what was ultimately discovered from Mays. Moreover, to accept Neville's position in this instance would encourage other PRPs to likewise "pass the buck" in response to requests for information, thereby interfering with CERCLA's goal of prompt investigation and cleanup.

60. Neville's failure to cooperate was remarkable to say the least. If other solvent PRPs had refused to cooperate as Neville did, CERCLA's goal of prompt cleanup, paid for by the parties responsible for the hazardous substances, would have been thwarted at the BRL. The Court finds that Neville's lack of cooperation was so persistent, pervasive and unjustified that it warrants, at the very least, a doubling of Neville's share of response costs from 3% to 6%.

61. In addition, as noted above, the cooperating PRPs ultimately persuaded the USEPA to accept a remedy with an estimated cost of $25 million, roughly half the cost of the remedy the USEPA selected in the ROD, which was estimated to cost between $48 million and $52 million. It would be unfair to the cooperating PRPs to allow Neville the windfall of sharing in the savings realized by the cooperating PRPs successful effort to find a less costly remedy for the BRL site, since Neville refused to participate in the effort, and contributed nothing to it. The Court concludes that this specific instance of non-cooperation provides an independent basis for doubling Neville's 3% share to a final share of 6%.

62. For these reasons, taking into account Neville's lack of cooperation, the Court finds that Neville's a fair and equitable share of response costs is 6%.

### V. Disposition

Based on the foregoing, the Court holds Neville liable under CERCLA § 113(f), 42 U.S.C. § 9613(f) as a responsible party under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3). The Court further declares that Neville's equitable share of past and future response costs for cleanup of the BRL is 6%, including prejudgment interest in accordance with 42 U.S.C. § 9607(a). *United States v. Township of Brighton,* 153 F.3d 307, 321 (6th Cir.1998); *Allied-Signal, Inc. v. Amcast Int'l Corp.,* 177 F.Supp.2d 713, 755–57 (S.D.Ohio 2001)(Rice, Chief Judge).

Consol and Triangle shall submit a proposed final judgment entry to this Court within fourteen days after the date of this order.

The Clerk shall remove these consolidated cases from the Court's pending cases and motions lists.

**IT IS SO ORDERED.**